### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**VICTORIA VALAIRE SCHAUB,**

**-vs-**                                                    **Case No.  6:07-cv-1162-Orl-28GJK**

**COMMISSIONER OF SOCIAL
SECURITY,**

_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Plaintiff Victoria Valaire Schaub ["Schaub"] appeals to the district court from a final

decision of the Commissioner of Social Security [the "Commissioner"] denying her application

for disability insurance benefits and supplemental security income payments.  _See_ Doc. No. 1

("Complaint"). For the reasons set forth below, it is recommended that the Commissioner's

decision be **REVERSED and REMANDED**.

**I.      BACKGROUND**

Schaub has a high school education and past relevant work as a cashier, bank teller and

fiberglass finisher.  R. 97.  Prior to her alleged onset date of September 11, 2004, Schaub was

treated for focal tendinosis of the supraspinatous tendon without evidence of rotator cuff tear,

moderate hypertrophic arthropathy[1] of the acromioclavicular joint "which may predispose

---

[1] Arthropathy is any joint disease. <u>Dorlands Illustrated Medical Dictionary</u> 160 (31st ed. 2007).

[Schaub] to an impingement syndrome." R. 183.  On February 19, 2001, she received treatment for back pain and knee pain.  R. 194. On August 22, 2002, Schaub was treated by Charles E. Kollmer, M.D. where she was diagnosed with joint pain with evidence of polyarthropathy and lumbrosacral strain. R. 176-77.  In September of 2002, Schaub was diagnosed with Rheumatoid arthritis, and her treating physician, Tina Fischer-Carne, M.D., wrote a letter to Schaub's place of employment stating the following:

> [Schaub] has recently been diagnosed with Rheumatoid arthritis which is a disorder of the connective tissue that attacks the joints.  This may cause some difficulty for her with regard to her current work description.  She will have difficulty with squatting and kneeling as well as pushing/pulling and grasping. She should be able to continue to perform these activities but only for limited time frames.  She should be allotted extra time to complete tasks if possible . . .

R. 189-90.  Schaub was referred to Yong H. Tsai, M.D., who felt that her symptoms were not consistent with rheumatoid arthritis although she did have a positive rheumatoid factor.  R. 186. Rather, Dr. Tsai felt her injuries were from overuse in combination with osteoarthritis.  *Id.*  He put Schaub on Tramadol and Prednisone. *Id.*

On September 25, 2002, Dr. Fisher-Carne completed a short-term disability form stating Schaub had limited joint movement that could lead to difficulty with gripping, squatting, and kneeling.  R. 187-88.  According to Dr. Fisher-Carne, Schaub needed to limit her amount of squatting, kneeling, and grasping but would be able to continue those activities in limited quantity and at a slower pace.  R. 187.  Her prognosis was fair and she should consider alternate tasks or be allotted more time to complete work. *Id.*  Her medical obstacle to return to work was listed as pain in joints of hands and knees.  R. 188.  She could perform sedentary or light work[2]

---

[2] Light work is lifting up to 10 lbs. frequently and up to 20 lbs. occasionally and/or frequent walk/stand and/or constant push/pull.

at a slow pace. *Id.* On December 20, 2002, Dr. Fisher-Carne noted Schaub's arthritic pain and continued Schaub's prescription of Ultram. R. 185.

Marilyn Juricic, M.D. treated Schaub for low back pain from January 2003 through June 2004. R. 282-299. On May 30, 2003, Dr. Juricic ordered Schaub a back brace for her chronic low back pain. R. 290. On January 30, 2004, Dr. Juricic noted that Schaub needed to taper her use of Ultram, and she prescribed her Neurontin.[3] R. 288. Dr. Juricic also noted that the joints revealed no evidence of inflammatory arthritis. *Id.* On February 27, 2004, Dr. Juricic indicated that Schaub had chronic pain secondary to osteoarthritis, and expressed that Schaub should try alternate therapy such as acupuncture and yoga. R. 286. On June 11, 2004, Schaub reported back pain and problems with her hands. R. 282. Dr. Juricic stated that there were no changes of rheumatoid arthritis, the rheumatoid factor was only slightly elevated and the sedimentation rate was completely normal. *Id.* Dr. Juricic diagnosed Schaub with osteoarthritis and advised her to continue taking Tylenol and Ibruprofen. *Id.* In regard to Schaub's back pain, Dr. Juricic noted that she was supposed to follow-up with Dr. Kollmer but had not, so they referred her to Dr. Sridhar for evaluation because Schaub had periodic symptoms of Sciatica.[4] R. 282. Following examination, Schaub was diagnosed with mild lumbar spondylosis. R. 299.

On October 18, 2004, Schaub complained of a frequency in urinating and pressure. A urinanalysis was performed which showed positive leukocytes, positive nitrates, trace of protein, small amount of ketones and a trace of blood. R. 281. Schaub was prescribed Trimethoprim/Sulfamethaxazole ("TMP/SMX, DS"). R. 281

[3] Neurontin is used for seizures or nerve pain. R. Arky, Physicians Desk Reference 2487 (61st ed. 2007).

[4] Sciatica is a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect. Dorland's at 1703.

3

On March 16, 2005, Schaub filed a claim for disability insurance benefits, claiming disability as of September 11, 2004.  R. 72-74.  On April 19, 2005, at the request of the state agency, Gregory M. Lower, D.O., CIME, an orthopedist, examined Schaub.  R. 238-244.  Dr. Lower's clinical impression contained the following:

    1.       Patellofemoral arthritis, right knee, without loss of range of motion.

    2.       Lumbar degenerative disc disease without significant radiculopathy.

    3.       Mild mechanical low back pain secondary to number two.

R. 241.  Dr. Lower also stated the following:

> Within a reasonable degree of medical probability, this patient's orthopedic disabilities that represent osteoarthritis, would five [sic] her difficulty with standing for protracted periods of time, walking long distances, repetitive bending, stooping or lifting.  The patient's current conditions would put her in a light duty to medium demand job with avoiding recurrent squatting at the present time.

R. 241.  On May 6, 2005, a residual functional capacity ("RFC") assessment performed on Schaub indicated she could lift or carry 20 pounds occasionally and 10 pounds frequently, she could stand or walk for a total of 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday, and push or pull with no limits. R. 246.  Furthermore, the RFC assessment indicated she could occasionally climb, kneel, crouch, or crawl and frequently balance or stoop. R. 247.  Finally, the RFC indicates that the symptoms explained by Schaub were partially credible based on "intact neuro and normal gait."  R. 250.

On May 10, 2005, Schaub's disability claim was denied.  R. 63-65.  On July 9, 2005, a second RFC assessment provided a substantially similar opinion as the previous RFC assessment and stated that Schaub's symptoms were partially credible with strength intact throughout. R.

253-60.  On August 22, 2005, Schaub's disability claim was denied upon reconsideration.  R. 59-60.

On September 14, 2005, Schaub was injured in motor vehicle accident and was examined by Dr. Kollmer.  R. 320-329.  Schaub was diagnosed with cervical spondylosis at C6-7, to a lesser extent at C5-6 and to an even lesser extent at C4-5.  R. 329.  There was no evidence of fracture or prevertebral soft tissue.  *Id.*  On September 22, 2005, Dr. Kollmer indicated Schaub suffered from cervical strain, lumbosacral strain, left knee sprain, and evidence of left hip sprain.  R. 328.  Schaub was prescribed physical therapy for four weeks, Robaxin, Relafen and Lortab.  *Id.*  Considering Schaub was currently attending Daytona Beach Community College, Dr. Kollmer noted she could continue with her regular school activities.  *Id.*

On September 28, 2005, Schaub began seeing David S. Chess, D.C., a chiropractor.  At her initial appointment, he diagnosed her with neck sprain and strain, lumbar sprain and strain, headache, and sprain and strain in an unspecified site at hip and thigh. R. 422.  He noted in his report that Schaub denied any bladder problems. R. 421.  He also noted that she was not presently working, so he provided no work restrictions. R. 423.  Schaub continued to see Dr. Chess through December 20, 2006, and his findings will be further discussed below. R. 330-423.

On October 20, 2005, Arthur W. Crossman, M.D. examined Schaub and noted that Schaub had atypical chest pain with a normal electrocardiogram ("EKG") and plan for exercise treadmill test.  R. 318-19.  On October 27, 2005, Dr. Crossman stated that Schaub had no EKG changes, and he would do an exercise sestamibi for a more accurate reading of whether Schaub suffered from significant coronary artery disease.  R. 317.  Dr. Crossman noted that Schaub refused to take Coumadin even though it was more successful than aspirin for preventing the

occurrence of a stroke, so she continued with aspirin.   R. 316.   Schaub also refused

catheterization. R. 315.   On October 28, 2005, a magnetic resonance imaging ("MRI") of

Schaub's lumbar spine reveals anterior disc protrusions present at L2-3 and L3-4 and

circumferential disc bulging at L4-5 which causes an anterior impression on the thecal sac. R.

425-26.   Sean M. Mahan, M.D. noted that the findings were stable and there was no evidence of

significant lateral disc herniation or significant subluxations. R. 425.

On November 1, 2005, after examining Schaub, Dr. Kollmer noted that she was a

candidate for epidural steroid injectional treatment, and her work restrictions would be "lifting

and carrying up to ten pounds and occasional bending, stooping, kneeling and crawling. R. 325.

The record indicates that Schaub returned to Dr. Crossman until April 13, 2006.  R. 314.  Dr.

Crossman indicated that he was going to refer Schaub to Dr. Henderson for a further referral for

atrial fibrillation ablation procedure.   R. 314.   He noted she was currently on Plavix and had

previously refused Coumadin.   *Id.*   He also stated that she would agree to catheterization if her

chest pain continued.   *Id.*   On April 28, 2006, Dr. Crossman diagnosed Schaub with coronary

artery disease and proscribed Crestor.   R. 313.   He also noted that she continued to refuse

Coumadin for atrial fibrillation.   *Id.*

On December 6, 2005, Leisa Youel, M.D., an orthopedic surgeon, examined Schaub at

the request of Dr. Kollmer.  Tr. 385-386.  Dr. Youel diagnosed Schaub with lumbosacral strain

and cervical strain. R. 386.  Dr. Youel noted the following:

> I explained to Ms. Schaub at great length the need for her to increase her daily
> exercise which she is not compliantly doing.  Prior to her accident she swam
> and did low impact aerobics and also rode her bicycle.  She is currently not
> doing any lumbar or cervical exercises which according to the patient she has
> been instructed and received prior instruction sheet, but she is currently not
> taking any time to do.  I explained to her the pathogenesis of osteoarthritis and

how her general comfort level in all of her joints can only improve when she increases her activity.

*Id.*  On December 13, 2005, Schaub was examined by Dr. Chess.  R. 383.  Dr. Chess noted significant improvement in Schaub and that she had returned to part time work.  *Id.*  On January 5, 2006, Dr. Chess noted that Schaub had sustained a permanent impairment to the body as a whole of 20%.  R. 378.  He stated that she was at maximum medical improvement, but she was still suffering from a great deal of pain and was only been able to return to work in a limited status. *Id.*

On February 14, 2006, Dr. Youel advised that Schaub had reached maximum medical improvement.  R. 370.  Dr. Youel again explained to Schaub the need for her to exercise and provided her with specific recommendations as to what she can do to improve her condition.  *Id.*  Dr. Youel also stated that Schaub had suffered a 14% total body impairment as a result of her motor vehicle accident.  *Id.*

On May 24, 2006, an MRI of Schaub's cervical spine revealed the following:

1.   Degenerative disc disease.
2.   The C2-3 disc space level demonstrates a central disc protrusion which touches the cord in the midline.  There is no spinal stenosis and the neural foramina appear normal.
3.   The C3-4 disc space level demonstrates a focal central herniated disc protrusion which indents the cord in the midline.  There is no spinal stenosis and the neural foramina are normal.
4.   The C4-5 disc space level demonstrates a focal central herniated disc protrusion which touches the cord in the midline.  There is no spinal stenosis and the neural foramina are normal.
5.   The C6-7 disc space level demonstrates a left paracentral herniated disc indenting the cord in a left paracentral location.  There is no spinal stenosis and the neural foramina are normal.

R. 441.  Dr. Mahan noted that there was a normal degree of lordosis, no evidence of desiccation of the discs, no evidence of subluxation, the signal intensity from the cord was normal without

7

evidence of contusion, syrinx or myelomalacia, and the cerebellar tonsils and fourth ventricle were in the normal position.  R. 440.

On June 5, 2006, Schaub returned to Dr. Chess. R. 356-57.  A review of an MRI from May 24, 2006, revealed C2-3 central disc protrusion with cord involvement, C3-4 central herniated disc protrusion with cord involvement, C4-5 HNP, and C6-7 left paracentral herniated nucleus pulposus ("HNP") indenting the cord. R. 357.  Dr. Chess stated:

> With this amount of damage to Ms. Schaub [sic] cervical spine only a grave long term prognosis can be made.  I will attempt to manage her with conservative treatment.  I think there is a high degree of probability that she will become a surgical candidate in the future.

*Id.*  On June 12, 2006, Dr. Chess wrote a letter stating that Schaub is unable to perform her previous employment duties.  R. 349.  He also states that since her vehicle accident, Schaub "has been considered Total Temporarily Disabled." *Id.*  Dr. Chess referred Schaub to a neurosurgeon as a possible candidate for surgery. *Id.*

On June 27, 2006, Schaub underwent a left heart catheterization, coronary angiography, left ventriculography, and PCL with drug-eluting stent of the ostia proximal right coronary artery. R. 308-09.  Dr. Crossman noted that Schaub had persistent chest pain with culprit 60% long ostia proximal dominant right coronary artery stenosis, otherwise no significant coronary artery disease.  R. 309.  On July 6, 2006, William H. Johnson, III, M.D. evaluated Schaub and in a letter to Dr. Crossman indicated that Schaub was in normal sinus rhythm and she had no noticeable atrial fibrillation.  R. 301.  On September 13, 2006, Dr. Crossman examined Schaub and noted normal blood pressure in response to exercise and fair to good exercise capacity.  R. 304.

On September 1, 2006, Dr. Chess noted that the cardiologist did not approve surgery at that time and Schaub's long term prognosis was poor. R. 342.  On November 16, 2006, Schaub visited Dr. Kollmer where he noted that Schaub was still attending school, she could walk up to a half of a mile, she could drive up to 2 hours, she could stand for about 5 minutes cleaning dishes, she could spend a half of an hour in a store, she had urinary frequency, she had shooting pains in her legs when straining at stool, and she had shooting pain when coughing and sneezing.  R. 320-23.  Dr. Kollmer noted Schaub complained of dysesthesias[5] in her lower extremities particularly at night. R. 320.  Examination revealed neck spasms, positive spurling's test, positive flexion, rotation and compression test particularly towards the left side. She had a positive Hoffman's sign, positive ulnar drift and inverted radial reflexes with the left side greater than the right and hyperflexia in the upper extremities. R. 322.  Her low back revealed a positive hyperextension test, positive posterior iliac crest tenderness with paraspinal muscle spasms, and tenderness and decreased forward flexion at 50 degrees. *Id.*  She was diagnosed with cervical spondylitic myelopathy,[6] evidence of some degenerative disc changes in the lower lumbar region. *Id.*  She was referred for an EMG of the left upper and lower extremities.  R. 323.  Upon exam, she showed a myelopathic pattern and would be a candidate for decompressive procedure. *Id.*  On December 20, 2006, a report from Dr. Chess indicates that Dr. Kollmer felt surgical intervention was the best option for Schaub and the doctors in Tampa agreed.  R. 331.

On February 2, 2007, the Honorable Leonard J. Gajewski, Administrative Law Judge ["ALJ"] held a hearing on Schaub's disability claim in Daytona Beach, Florida.  R. 449-469.

---

[5] Dysesthesia is an unpleasant abnormal sensation produced by normal stimuli. Dorland's at 584.

[6] Cervical spondylotic myelopathy is secondary to encroachment by cervical spondylosis on the spinal cord within the spinal cord. Dorland's at 1239.

Non-attorney Shelly Lynn represented Schaub at the hearing.  R. 449.  Schaub and vocational

expert Richard J. Hickey ("VE") testified at the hearing.  *Id.*  At the hearing, Schaub testified that

she performed part-time work cleaning condos following the date she alleges to have become

disabled but prior to her automobile accident. R. 454.  Following her accident, she testified that

she "attempted to do some light cleaning jobs and [she] was working for a lawn service as a

secretary and a helper" but she quit because she could not do any lifting or bending.  R. 455.  She

also testified that she could not sit at a computer due to neck cramps and pain.  *Id.*  In regard to

her urinary frequency, Schaub stated that in an average day she goes to the restroom about 10

times and the frequency depends on how her neck is – if she turns her neck a certain way, she

immediately has to go to the restroom.  R. 457.  Additionally, Schaub testified that for exercise

she walks and swims aside from household chores, and she drives at least three times a week.  R.

459, 463.  Schaub indicated that two doctors recommended surgery for her neck and back

problems, but she cannot afford the procedure because she has Medicaid, which will not pay for

it. R. 461.

On March 2, 2007, the ALJ issued a decision that Schaub was not disabled finding the

following:

1.    Schaub has not engaged in substantial gainful activity since September 11,
      2004, the alleged disability onset date.

2.    Schaub has the following severe impairment:  right shoulder and knee
      degenerative joint disease, and degenerative disc disease with
      osteoarthritis.

3.    Schaub has the RFC to lift/carry 20 pounds occasionally and 10 pounds
      frequently; to stand/walk for about 6 hours in an 8-hour workday; and to
      sit for 6 hours in an 8-hour workday.  She is precluded from more than
      occasionally stooping, kneeling, crouching, crawling and climbing.  He

10

also stated his RFC assessment was consistent with the overall medical evidence.

4.      Schaub's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.

5.      Schaub is able to perform her past relevant work as a cashier.

R. 11-21. Schaub requested review by the Appeals Council, and on May 18, 2007, the Appeals Council denied review. R 5-7.

On July 12, 2007, Schaub timely appealed the Appeals Council's decision to the United States District Court. Doc. No. 1. On November 19, 2007, Schaub filed a memorandum of law in support of her appeal. Doc. No. 14. On February 19, 2008, the Commissioner filed a memorandum in support of his decision that Schaub was not disabled. Doc. No. 18. The appeal is ripe for determination.

## II.      **THE PARTIES' POSITIONS**

Schaub assigns three errors to the ALJ. First, Schaub claims that the ALJ erred in failing to articulate any basis for not crediting the opinions of Schaub's treating orthopedist, Dr. Charles A. Kollmer, as to Schaub's need to avoid lifting greater than ten pounds and her treating physician, Dr. Fisher-Carne, as to her limited joint movement. Second, Schaub claims that the ALJ erred in failing to articulate any basis for not crediting the examining opinion of his own hand-picked examining consultant, Dr. Lower, a Board Certified orthopedist, that Schaub needed to avoid standing for prolonged periods. Third, Schaub claims that the ALJ erred in failing to find that Schaub suffered from a severe cardiac impairment, to meaningfully evaluate her diagnosis of cervical spondylitic myelopathy, and to consider her urinary frequency problems.

11

The Commissioner argues that substantial evidence supports his decision to deny Robinson disability.

III.    **LEGAL STANDARDS**

    A.    **THE ALJ'S FIVE-STEP DISABILITY ANALYSIS**

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b).  Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves performing significant physical or mental activities. 20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized. 20 CFR §§ 404.1572(b), 416.972(b).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 CFR §§ 404.1574, 404.1575, 416.974, 416.975.  If an individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "severe" within the

meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Comm'r*, 265 F.2d 1214, 1219 (11th Cir. 2001). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404,

Subpart P, Appendix 1 (the "Listing(s)"). 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.   If the claimant's impairment or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled.   If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's RFC. 20 CFR §§ 404.1520(e), 416.920(e).   An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments.   In making this finding, the ALJ must also consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).   The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.   *See* 20 C.F.R. § 404.1545(b).   The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.   *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).   If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.   *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).   The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.   In addition, the work must have lasted long enough for

14

the claimant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  If the claimant has the RFC to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth and final step.

At the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

## B.    THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v.*

*Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord*, *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir.

16

1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984).  A claimant may

be entitled to an immediate award of benefits where the claimant has suffered an injustice,

*Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the

record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*,

765 F.2d 1090, 1094 (11th Cir. 1985).

The district court may remand a case to the Commissioner for a rehearing under

sentences four or six of 42 U.S.C. § 405(g); or under both sentences.  *Jackson v. Chater*, 99 F.3d

1086, 1089-92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court

must either find that the Commissioner's decision is not supported by substantial evidence, or

that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99

F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of

claimant's RFC); *accord*, *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand

appropriate where record was insufficient to affirm, but also was insufficient for district court to

find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a

sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his

decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to

allow ALJ to explain his basis for determining that claimant's depression did not significantly

affect her ability to work).[7]  In contrast, sentence six of 42 U.S.C. § 405(g) provides:

---

[7] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1) that there is new, non-cumulative evidence; 2) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090-92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).  A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.[8]

## IV.   ANALYSIS OF ALLEGED ERRORS

### A.  Whether the ALJ Erred In Failing To Articulate Any Basis For Not Crediting the Opinions of Dr. Kollmer, Dr. Fisher-Carne and Dr. Lower.

Because the first two errors alleged are similar, the Court will discuss them together. Schaub argues that the ALJ erred in failing to articulate any basis for not crediting the opinions of Dr. Kollmer, Dr. Fisher-Carne, and Dr. Lower.  On November 1, 2005, Dr. Kollmer, a treating physician, stated that Schaub's work restrictions would be lifting and carrying up to ten pounds and occasional bending, stooping, kneeling and crawling.  R. 325.  The ALJ determined that Schaub had the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently; to stand/walk for about 6 hours in an 8-hour workday; and to sit for 6 hours in an 8-hour workday.  R. 17.

---

[8] With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Id.*  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.  *Id.*

Schaub argues that the ALJ erred by not providing any reasons for not crediting Dr. Kollmer's opinion.  Schaub argues that the failure of the ALJ to specify what weight is given to a treating physician's opinion is reversible error. Doc. No. 14 at 10.

Schaub also argues that the ALJ failed to articulate any reason for not crediting Dr. Fisher-Carne's opinion that Schaub suffers from limited joint movement due to her rheumatoid arthritis.  *See* R. 189-90.  Although Dr. Fisher-Carne provided this opinion in September 2002, prior to Schaub's alleged onset date, Schaub argues that this condition "did not disappear." Doc. No. 14 at 9.  Finally, Schaub argues that the ALJ erred by not providing any basis for not crediting the consulting examiner, Dr. Lower's, opinion who opined that Schaub's orthopedic disabilities would result in difficulty standing for protracted periods of time, walking long distances, repetitive bending, stooping or lifting.  Doc. No. 14 at 14; R. 241.

The Commissioner argues that the ALJ properly rejected the assessments from Dr. Kollmer, Dr. Fisher-Carne and Dr. Lower.  Doc. No. 18 at 3.  The Commissioner quotes the relevant portions of the ALJ's opinion to support his argument. *Id.* at 4-5.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Comm'r of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).[9]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-

---

[9] The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on the issue of whether the claimant meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527(e).

supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the following:

1) length of the treatment relationship and the frequency of examination;

2) the nature and extent of the treatment relationship;

3) the medical evidence supporting the opinion;

4) consistency with the record as a whole;

5) specialization in the medical issues at issue; and

6) other factors which tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th

Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

Although the ALJ provided a thorough review of each of the respective doctors' RFC assessments and diagnoses, he did not specifically state how much weight he accorded any of the physicians' opinions, which is reversible error.  *See Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (The ALJ must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error).  In his opinion, the ALJ did not articulate whether he was rejecting or crediting any of the physician's assessments, much less state how much weight, if any, was given to those assessments.[10]  The Commissioner quotes in his brief two lengthy excerpts of the ALJ's opinion to support his argument that the ALJ properly weighed the physician's opinions.  *See* Doc. No. 18 at 4-6.  However, the quoted excerpts do not specifically articulate what weight was given to each of the doctor's opinions.  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).[11]  Accordingly, the Commissioner's decision should be **REVERSED and REMANDED**.

---

[10] The ALJ stated in his opinion that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." R. 20.  This statement is inconsistent with the record, specifically, Dr. Kollmer's assessment.  The ALJ determined that Schaub has the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently, whereas Dr. Kollmer stated that Schaub's work restrictions would be lifting and carrying up to ten pounds.  *See Nyberg v. Comm'r*, 179 Fed.Appx. 589, 591 (11th Cir. 2006).

[11] Although both Schaub and the Commissioner argue that the ALJ "rejected" Drs. Kollmer, Fisher-Carne, and Lower's opinions and provided reasons therefore, the ALJ did not specifically reject or credit any of the physicians' opinions or diagnoses.  Rather, the ALJ merely makes a general statement that he gives weight to each doctor's opinion, delineates each of the doctor's opinions and then follows with his ultimate decision.  R. 19-21.

**B.      Whether the ALJ Erred In Failing To Find That Schaub Suffered From a Severe Cardiac Impairment, To Meaningfully Evaluate Her Diagnosis of Cervical Spondylitic Myelopathy, and To Consider Her Urinary Frequency Problems.**

Schaub argues that the ALJ erred by not finding that she suffered from a severe cardiac impairment, to meaningfully address her diagnosis of cervical spondylitic myelopathy, and to consider her urinary frequency.  The Commissioner argues that the ALJ mentioned evaluations of Drs. Lower, Chess, and Youel, thus, properly evaluating Schaub's medical records regarding evidence of Schaub's cervical spondylitic myelopathy and other cervical impairments.  However, in his argument the Commissioner says nothing about Dr. Kollmer, who diagnosed Schaub with spondylitic myelopathy.  The ALJ's opinion does not mention Dr. Kollmer's diagnosis of spondylitic myelopathy.  The Court cannot characterize this failure as harmless without re-weighing the evidence.  *See Nyberg*, 179 Fed.Appx. at 591.  The Eleventh Circuit in *Nyberg* stated the following:

> The instant case, however, is not one where the unmentioned physician's opinion merely supported the ALJ's conclusion, and was thus unnecessary. *See Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004).  On the contrary, the potential impact of Dr. Trowbridge's opinion on the ALJ's analysis is strongly and reasonably disputed by the parties.  Thus, we cannot say that the failure to address Dr. Trowbridge's opinion was harmless without re-weighing and engaging in conjecture that invades the province of the ALJ.  *See Moore*, 405 F.3d at 1214 (stating that, where the ALJ failed to consider certain factors and indicate their impact on his ultimate conclusion as to claimant's [RFC], we [could not] even evaluate the Commissioner's contention that the ALJ's error was harmless).

*Nyberg*, 179 Fed.Appx. at 591 (internal quotations and footnotes omitted).  Thus, it is recommended that the Commissioner's decision be **REVERSED and REMANDED**.

Because the Court recommends that this case be remanded for further consideration, it is unnecessary to address the parties' arguments regarding whether the ALJ failed to make specific findings concerning Schaub's urinary frequency and her heart condition.

## V.    <u>CONCLUSION</u>

For the reasons stated above, it is recommended that the Commissioner's decision be **REVERSED and REMANDED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on August 13, 2008.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

The Honorable John Antoon II
United States District Judge

Chantal J. Harrington
Bohr & Harrington, LLC
Suite C
800 Third Street
Neptune Beach, Florida 32266-5060

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Nadine DeLuca Elder, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Leonard J. Gajewski
Administrative Law Judge
c/o Social Security Administration
Office of Disability Adjudication and Review
800 South Gay Street, Suite 700
First Tenn Plaza
Knoxville, Tennessee 37292-9703